No. 24-60580

————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

————————————

SOUTH TEXAS ENVIRONMENTAL JUSTICE NETWORK,
*Petitioner*

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY;
JON NIERMANN, in his official capacity as Chairperson of the Texas
Commission on Environmental Quality; Kelly Keel, in her official
capacity as Executive Director of the Texas Commission on
Environmental Quality,
*Respondents*

————————————

TEXAS LNG BROWNSVILLE, L.L.C.,
*Intervenor for Respondent.*

On Petition for Review of Order of the Texas Commission of
Environmental Quality

**INITIAL BRIEF OF PETITIONER**

[Additional Information on Next Page]

## CERTIFICATE OF INTERESTED PERSONS
### CASE NO. 24-60580

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

### **Petitioner**

South Texas Environmental Justice Network is an organization based in Texas with a headquarters located at 1235 E Adams St., Brownsville, Texas 78521.

### **Counsel for Petitioners**

Thomas Gosselin
Environmental Integrity Project
98 San Jacinto Boulevard
Suite 400
Austin, TX 78701
tgosselin@environmentalintegriy.org

i

**Thomas Gosselin**
Environmental Integrity Project
98 San Jacinto Boulevard
Suite 400
Austin, TX 78701
Telephone: (512) 316-7194
tgosselin@environmentalintegrity.org

*Attorney for South Texas*
*Environmental Justice Network*

**Dated: April 14, 2025**

## Respondents

1. Texas Commission on Environmental Quality;

2. Jon Niermann, in his official capacity as Chairperson of the Texas Commission on Environmental Quality; and

3. Kelly Keel, in her capacity as Executive Director of the Texas Commission on Environmental Quality.

## Counsel for Respondent

Catherine Hobson
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548 (MC-066)
Austin, TX 78711-2548
katie.hobson@oag.texas.gov

Kelly Keel
TCEQ
P.O. Box 13087 (MC-109)
Austin, Tx 78711

Eno Peters
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548 (MC-066)
Austin, TX 78711-2548
eno.peter@oag.texas.gov

**Respondent-Intervenor**

   Texas LNG Brownsville, L.L.C.

**Counsel for Respondent-Intervenors**

Beth Bivans Petronio, Esq., Trial Attorney
K & L Gates, L.L.P.
1717 Main Street, Suite 2800
Dallas, TX 75201
beth.petronio@klgates.com

***s/ Thomas Gosselin***
Thomas Gosselin
Environmental Integrity Project
98 San Jacinto Boulevard
Suite 400
Austin, TX 78701
Telephone: (512) 316-7194
tgosselin@environmentalintegrity.org

## REQUEST FOR ORAL ARGUMENT

This case concerns whether the Texas Commission on Environmental Quality ("TCEQ") lawfully issued an extension to Texas LNG Brownsville LLC's ("Texas LNG") deadline to begin construction of its liquefied natural gas ("LNG") export terminal (the "Terminal") under its New Source Review ("NSR") permit. Pursuant to 5th Cir. R. 28.2.3, South Texas Environmental Justice Network ("STEJN") respectfully submits that oral argument would assist the Court with the complex factual and legal issues presented by this case and requests oral argument for that reason.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

REQUEST FOR ORAL ARGUMENT.....................................................iv

TABLE OF AUTHORITIES...............................................................vii

GLOSSARY ....................................................................................x

JURISDICTIONAL STATEMENT ......................................................1

    I.   Venue and Forum .................................................................1

    II.  Standing................................................................................3

STATEMENT OF ISSUES.................................................................9

STATEMENT OF THE CASE ...........................................................10

    I.   Introduction .........................................................................10

    II.  Legal Framework.................................................................12

          A.   The Clean Air Act ....................................................12

          B.   NSR Permitting Program ................................................13

          C.   Deadline to Begin Construction ......................................19

          D.   Extension Application Process .......................................20

    III. Factual Background.............................................................21

SUMMARY OF ARGUMENT .................................................................23

ARGUMENT ....................................................................................25

    I.   Standard of Review...............................................................25

    II.  The Executive Director Lacked Authority to Grant the Third Extension ...............................................................................26

    III. The Third Extension is Invalid Because Texas LNG Failed to Make the Required Demonstrations .......................................33

          A.   Texas LNG's NSR Permit Was Already Void When it Requested the Third Extension.......................................33

B.  Texas LNG Failed to Demonstrate Compliance With TCEQ's Regulations and the Purpose of the Clean Air Act ..................................................................................... 36

C.  Texas LNG Failed to Demonstrate Compliance with the Expenditure Requirements ............................................... 47

D.  Because Texas LNG Failed to Make any of the Required Demonstrations, the Third Extension is Unlawful .......... 49

IV. Remedy ...................................................................................... 52

CONCLUSION ...................................................................................... 52

CERTIFICATE OF SERVICE ............................................................... 53

CERTIFICATE OF COMPLIANCE ..................................................... 54

CERTIFICATE OF ELECTRONIC COMPLIANCE ............................ 55

# TABLE OF AUTHORITIES

## Cases

*AC Interests v. Texas Commission on Environmental Quality*, 543 S.W.3d 703 (Tex. 2018) .................................................................. 25

*Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461 (2004) .......................................................................................... 41

*Ammex, Inc. v. Wenk*, 936 F.3d 355 (6th Cir. 2019) .............................. 13

*City of Marshall v. City of Uncertain*, 124 S.W.3d 690 (Tex.App.—Austin 2003) ................................................................................................. 27

*City of Port Isabel v. Federal Energy Regulatory Commission*, 111 F.4th 1198 (D.C. Cir. 2024) ......................................................................... 43

*Friends of Buckingham v. State Air Pollution Control Board*, 947 F.3d 68 (4th Cir. 2020) ................................................................................ 41

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ............................................................................................ 3

*Gulf Restoration Network v. Salazar*, 683 F.3d 158 (5th Cir. 2012) ........ 9

*Havasupai Tribe v. Provencio*, 906 F.3d 1155 (9th Cir. 2018) ................ 6

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981) .......................................................................................... 12

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) ......................................................................................... 3, 9

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ...................................... 8

*Oncor Elec. Delivery LLC v. Public Utility Com'n of Texas*, 406 S.W.3d 253 (Tex.App.—Austin 2013) ............................................................. 51

*Park Haven, Inc. v. Texas Dept. Of Human Services*, 80 S.W.3d 211 (Tex.App.—Austin 2004) ..................................................................... 50

*Save Our Cmty. v. U.S. EPA*, 971 F.2d 1155 (5th Cir. 1992) ............. 4, 7

*Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634 (5th Cir. 1983) ............. 7

*Sierra Club v. EPA*, 705 F.3d 458 (D.C. Cir. 2013) ............................... 17

*Sierra Club v. Louisiana Department of Environmental Quality*, 100 F.4th 555 (5th Cir. 2024) ........................................................... 2, 13, 25

*Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546 (5th Cir. 1996) ..................................................................................... 8

*Smith v. Houston Chemical Services, Inc.*, 872 S.W.2d 252 (Tex. App.—
  Austin 1994) ........................................................................................25
*Starr County v. Starr Indus. Services, Inc.*, 584 S.W.2d 352 (Tex.App.—
  Austin 1979) ........................................................................................26
*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum
  Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) .............................................5
*United Copper Industries, Inc. v. Grissom*, 17 S.W.3d 797 (Tex. App.—
  Austin 2000) ...............................................................................25, 26
*Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th
  1321 (D.C. Cir. 2021) ..........................................................................36

## Statutes

15 U.S.C. 717b .......................................................................................1
15 U.S.C. 717r .......................................................................................1
42 U.S.C. 7409 .....................................................................................14
42 U.S.C. 7410 ...............................................................................12, 13
Texas Government Code 2001.174....................................................26, 52
Texas Health & Safety Code 382.032 .............................................1, 3, 25
Texas Health & Safety Code 382.041 ..................................................48
Texas Water Code 5.052.......................................................................20
Texas Water Code 5.102.......................................................................20
Texas Water Code 5.122.......................................................................20
Texas Water Code 5.271.......................................................................23
Texas Water Code 5.351.........................................................................3
Texas Water Code 5.354.........................................................................1

## Other Authorities

EPA, *Guidance on Significant Impact Levels for Ozone and Fine
  Particles in the Prevention of Significant Deterioration Permitting
  Program* (Apr. 17, 2018) ......................................................16, 17, 44
EPA, *Reconsideration of the National Ambient Air Quality Standards
  for Particulate Matter*, 89 Fed. Reg. 16202 (Mar. 6, 2024) ..........15, 42

EPA, *Supplement to the Guidance on Significant Impact Levels for Ozone and Fine Particles in the Prevention of Significant Deterioration Permitting Program* (Apr. 30, 2024) ........... 16, 17, 44, 45

TCEQ, *Air Pollution Control How to Conduct a Pollution Control Evaluation* (Jan. 2011).......................................... 18, 19, 37, 40, 41, 46

TCEQ, *Air Quality Modeling Guidelines* (Jun. 2024) ... 14, 15, 16, 17, 44, 45, 46

TCEQ, *An Order Granting the Application by Texas LNG Brownsville LLC for Permit No. 139561*, TCEQ Docket No. 2019-0624-AIR, SOAH Docket No. 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, 2020 WL 2544372 (May 14, 2020) ........ 21, 40

*Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130 (Nov. 22, 2019) ... 7, 21

*Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047 (Apr. 21, 2023) .... 4, 7, 21, 43, 45

## Regulations

30 TAC 116.10 ................................................................................. 18, 40

30 TAC 116.110 ...................................................................................... 13

30 TAC 116.111 ................................................................................ 13, 40

30 TAC 116.120 .................................. 1, 10, 19, 20, 22, 33, 34, 35, 37, 47

30 TAC 50.131 ........................................................................................ 20

30 TAC 50.133 ................................... 9, 20, 27, 28, 29, 30, 31, 32

30 TAC 50.139 ............................................................................ 2, 20, 29

30 TAC 55.201 ............................................................................... 2, 20

40 C.F.R. 52.2270 ........................................................................ 1, 13

40 C.F.R. 63.670 ................................................................................ 38

# GLOSSARY

The following acronyms and abbreviations used in this brief:

| | |
|---|---|
| BACT | Best Available Control Technology |
| EPA | Environmental Protection Agency |
| FERC | Federal Energy Regulatory Commission |
| LNG | Liquefied Natural Gas |
| NAAQS | National Ambient Air Quality Standards |
| NSR | New Source Review |
| $PM_{2.5}$ | Particle Matter 2.5 Microns or Less in Diameter |
| SILs | Significant Impact Levels |
| SIP | State Implementation Plan |
| STEJN | South Texas Environmental Justice Network |
| TCEQ | Texas Commission on Environmental Quality |
| Texas LNG | Texas LNG Brownsville LLC |

# JURISDICTIONAL STATEMENT

## I. Venue and Forum

This petition is brought under either or both of Texas Health & Safety Code 382.032 ("THSC") and Texas Water Code 5.354 ("TWC"). Normally, this would mean that venue is proper in a district court of Travis County, Texas.

However, under the Natural Gas Act, this Court "shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a State administrative agency acting pursuant to Federal law to issue ... any permit, license, concurrence, or approval required under Federal law," to facilities that are subject to regulation under 15 U.S.C. 717b, including the Terminal. 15 U.S.C. 717r(d)(1).

The Natural Gas Act controls here. TCEQ issued the challenged construction deadline extension pursuant to Texas' federally enforceable State Implementation Plan ("SIP"). *See* 30 TAC 116.120 (construction deadline extension provisions); 40 C.F.R. 52.2270(c) (identifying the provisions of Texas' SIP, which includes 30 TAC 116.120). This Court has held that a state administrative agency acts pursuant to federal law for the purposes of the Natural Gas Act when it

1

issues an order pursuant to a SIP provision. *Sierra Club v. Louisiana Department of Environmental Quality*, 100 F.4th 555, 564-65 (5th Cir. 2024) [*Commonwealth LNG*].

STEJN has satisfied all other jurisdictional prerequisites by exhausting its administrative remedies and timely filing this petition for review. The order being challenged was issued on July 22, 2024. STEJN timely filed a motion to overturn on August 14, 2024. ROA.048; 30 TAC 50.139(b) (motions to overturn must be filed within 23 days). Out of an abundance of caution STEJN also timely filed a request for reconsideration on August 21, 2024. ROA.056; 30 TAC 55.201(a) (requests for reconsideration must be filed within 30 days). TCEQ extended its deadline to act on the motion to overturn until October 11, 2024. ROA.066; 30 TAC 50.139(e) (providing this authority); *see also* 30 TAC 50.139(f)(1) (providing TCEQ a 45-day deadline to act on a motion to overturn absent an extension). When TCEQ failed to act on the motion to overturn by October 11, 2024, the motion to overturn was overruled by operation of law. 30 TAC 50.139(f)(2). TCEQ has not taken any action on the request for reconsideration. STEJN then timely filed the petition for review instituting this case on November 8, 2024, 28

days after the motion to overturn was overruled by operation of law.

THSC 382.032(b) (petition for review must be filed within the time

permitted by TWC 5.351); TWC 5.351(c)(2)(B) (petition for review must

be filed within 30 days after the administrative appeal of an action by

TCEQ's Executive Director is overruled by operation of law).

Accordingly, this Court has original and exclusive jurisdiction over

this case.

## II.   Standing

An organization has standing if individual members would have

standing, the interests at stake are germane to the organization's

purpose, and the lawsuit does not require the participation of individual

members. *Hunt v. Washington State Apple Advertising Commission*, 432

U.S. 333, 343 (1977).

STEJN's individual members have standing because (1) they have

suffered a concrete and imminent "injury in fact;" (2) that is fairly

traceable to the challenged action; and (3) is likely to be redressed by a

favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

*(TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted).

Any "harm to aesthetic, environmental, or recreational interests is

sufficient to confer standing, ... and these need not be large, an identifiable trifle will suffice." *Save Our Cmty. v. U.S. EPA*, 971 F.2d 1155, 1161 (5th Cir. 1992) (internal quotations and citations omitted).

TCEQ's decision to extend Texas LNG's deadline to begin construction will allow Texas LNG to emit air pollution that will harm STEJN members. One member, Juan Mancias, recreates by fishing and hiking at the Bahia Grande Unit of the Laguna Atascosa National Wildlife Refuge, which abuts the Texas LNG site. Mancias Decl. ¶13; *id.* Ex. A at 1-16, 4-10, and 4-106. Specifically, Mr. Mancias fishes and hikes approximately two-to-three times per month for each activity "right next to the Texas LNG site," and plans to continue doing so. Mancias Decl. ¶13. When engaged in these activities next to the Texas LNG site, he will be inhaling Texas LNG's harmful air pollution. *Id.* ¶14; *see Texas LNG Brownsville LLC*, 183 FERC ¶ 61,047, P69 (Apr. 21, 2023) [*FERC Remand Order*] (Texas LNG's emissions will specifically impact concentrations of nitrogen oxides and particulate matter, including fine particulate matter, at this location.) Breathing and smelling this polluted air will harm Mr. Mancias' health, especially because he relies on supplemental oxygen to treat existing respiratory

4

symptoms and will adversely impact his enjoyment of fishing and hiking there. *Id.* ¶¶9, 14. These injuries alone confer standing. *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) ("breathing and smelling polluted air is sufficient to demonstrate injury-in-fact").

Another STEJN member will be similarly injured. Rebekah Hinojosa goes to the same location at the Bahia Grande Unit approximately once every two months and she plans to continue to do so. Hinojosa Decl. ¶9. She will also breathe pollution from Texas LNG when she is there which will both impact her health and her enjoyment of being at this wildlife refuge. *Id.* ¶10.

Mr. Mancias is also a member of the Carrizo Comecrudo Tribe of Texas. Texas LNG's site incurs on Garcia Pasture, one the Tribe's most sacred sites. Mancias Decl. ¶¶5-6. While neither he (nor other tribal members) can access Garcia Pasture, he goes as close as he can get to worship approximately once a week, and plans to continue doing so in the future. *Id.* ¶¶7-8. That location is "immediately next to the Texas LNG site." *Id.* ¶7. Worshipping here "is an extremely important part" of the Tribe's religious practice. *Id.* Another STEJN member, Dr.

5

Christopher Basaldu, goes to the same location to worship approximately once every three months and plans to continue doing so. Basaldu Decl. ¶¶7-8.

Both Mr. Mancias and Dr. Basaldu will be injured by Texas LNG when they worship at Garcia Pasture. Both will be injured by inhaling Texas LNG's pollution when they are there. Mancias Decl. ¶¶8-9; Basaldu Decl. ¶9. They will also be injured because Texas LNG's emissions, and its existence, will place a substantial burden on their ability to worship at Garcia Pasture. Mancias Decl. ¶¶9-12;[1] Basaldu Decl. ¶¶9-13. This injury also confers standing. *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1162 n.3 (9th Cir. 2018) (tribe had standing to challenge a Forest Service determination that a company had valid mining rights in a national forest because mining there "causes concrete injury to the Tribe's religious and cultural interests").

Finally, STEJN's members would experience injury to their aesthetic and recreational interests. As already explained, Mr. Mancias

---

[1] Mr. Mancias' declaration contains two paragraph 12s. This citation refers to the second paragraph 12.

and Ms. Hinojosa recreate adjacent to the Texas LNG site. All three of Mr. Mancias, Ms. Hinojosa, and Dr. Basaldu specifically enjoy the aesthetic beauty of the area around the Texas LNG site. Mancias Decl. ¶¶10, 12, 14; Hinojosa Decl. ¶¶11-12; Basaldu Decl. ¶10. As of now, that area is devoid of visual impacts. *FERC Remand Order* P78. Construction and operation of Texas LNG will diminish these members' enjoyment of recreation and the aesthetics of this area because Texas LNG's construction, flare (and flare emissions), and overall visual impact will be readily visible. Mancias Decl. ¶¶10, 12, 14, 17 Ex. A 4-132-33; Hinojosa Decl. ¶¶11-12; Basaldu Decl. ¶10; *Texas LNG Brownsville LLC*, 169 FERC ¶ 61,130, P5 (Nov. 22, 2019) [*FERC Authorization Order*] (explaining that Texas LNG will have significant adverse visual impacts when viewed from the Laguna Atascosa National Wildlife Refuge and would contribute to significant adverse impacts on the ocelot and aplomado falcon). These injuries confer standing. *Save Our Wetlands, Inc. v. Sands*, 711 F.2d 634, 640 (5th Cir. 1983); *Save our Cmty.*, 971 F.2d at 1161.

All these injuries are fairly traceable to the challenged construction deadline extension decision, which allows Texas LNG to

7

construct the LNG plant and emit the pollution that will cause the injuries. Additionally, there is a close geographic and causal nexus between Texas LNG's air pollution emissions and where STEJN's members breathe and recreate. That is sufficient to demonstrate traceability. *See Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 558 (5th Cir. 1996) (traceability "does not require that the plaintiffs show to a scientific certainty that [the] defendant's effluent, and [the] defendant's effluent alone, caused the precise harm suffered by the plaintiffs" (quotation marks and citation omitted)).

A favorable decision would redress these injuries because it would automatically void Texas LNG's underlying permit. Insofar as Texas LNG wishes to continue to pursue its project, it would need to apply for a new NSR permit and conduct new analyses to support that application. Even if Texas LNG's permit were not void, a favorable decision would require TCEQ to, *inter alia*, evaluate whether to require more stringent pollution controls or whether to issue a construction deadline extension at all. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992).

8

The interests at issue in this case are germane to STEJN's purpose to protect people in South Texas and South Texas' Rio Grande Valley from environmental injuries, specifically including those from LNG terminals. Hinojosa Decl ¶4; *see Gulf Restoration Network v. Salazar*, 683 F.3d 158, 168 (5th Cir. 2012). Moreover, neither the claims asserted nor the relief sought requires the participation of any individual member. *Id.* (quoting *Hunt*, 432 U.S. at 344).

## STATEMENT OF ISSUES

This case presents three issues:

1. For TCEQ's Executive Director to exercise delegated authority, several conditions must be satisfied. 30 TAC 50.133(a). Did the Executive Director lawfully exercise delegated authority to issue a construction deadline extension if at least one of these conditions was not satisfied?

2. New Source Review permits are automatically void where a permit holder fails to begin construction within 18 months of the permit issuing, absent an extension. 30 TAC

116.120(a)(1). Was the decision to grant Texas LNG a third
extension of its New Source Review permit invalid because
Texas LNG's permit was already void?

3. An NSR permit holder must make several demonstrations to
receive a third construction deadline extension. 30 TAC
116.120(b)-(c). Did TCEQ act unlawfully in granting Texas
LNG a third extension when it failed to make at least one of
these demonstrations?

## STATEMENT OF THE CASE

## I.    Introduction

TCEQ first permitted Texas LNG's Terminal on May 14, 2020.
One condition of this permit (the "Permit") required Texas LNG to begin
construction within 18 months, or by November 12, 2021. Texas LNG
still has not begun construction. Instead, Texas LNG has requested,
and TCEQ has issued, three construction deadline extensions. This case
concerns the last of those three extensions (the "Third Extension").

The Executive Director's decision to issue the Third Extension, and TCEQ's failure to overturn the Executive Director's decision, is unlawful for three reasons.

First, the Executive Director only had the authority to issue the Third Extension if several conditions were satisfied. The Executive Director failed to satisfy five of these conditions.

Second, the Permit was already void when the Executive Director issued the Third Extension.

Third, Texas LNG failed to make three required demonstrations. Between when TCEQ issued the Permit in 2020 and when Texas LNG requested its third extension in 2024, circumstances changed dramatically. Before Texas LNG applied for the Third Extension, the Environmental Protection Agency tightened the health-based National Ambient Air Quality Standard ("NAAQS") for concentration for fine particulate matter ("PM$_{2.5}$"). While the area around the Terminal was in compliance with the NAAQS in 2020, it now violates the new NAAQS standard—even before adding Texas LNG's emissions to the mix. To receive the Third Extension, Texas LNG was required demonstrate, *inter alia*, its emission limits comply with current Best Available

11

Control Technology requirements and its impacts on air quality do not violate the new NAAQS. Texas LNG demonstrated neither.

Texas LNG was also required to show that it has spent, or committed to spend, a sufficient amount of money on its terminal project to justify the Third Extension. There is no record evidence that it did so.

Nothing shows Texas LNG's failure to make each of these demonstrations more than the fact that the Executive Director's entire determination that Texas LNG did so consists of three bullet points, three utterly conclusory statements with not a shred more. For these reasons, this Court should reverse Texas LNG's third construction deadline extension.

## II.  Legal Framework

### A. The Clean Air Act

The Clean Air Act establishes a system of cooperative federalism for regulating air pollution. 42 U.S.C. 7410. The U.S. Environmental Protection Agency ("EPA") sets minimum standards and the states administer the various regulatory programs. *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 269 (1981). Texas does

this through a "state implementation plan" or "SIP," subject to EPA approval. 42 U.S.C. 7410(a)(1)-(2); *see* 40 C.F.R. 52.2270(c) (identifying EPA-approved regulations in the Texas SIP). Once approved, SIP provisions become federally enforceable. *Commonwealth LNG*, 100 F.4th at 564; *see also Ammex, Inc. v. Wenk*, 936 F.3d 355, 361 (6th Cir. 2019) (concluding that Michigan's fuel law, made in compliance with EPA's standards, is federal law, based on "the way courts have consistently treated SIPs."). TCEQ implements the Texas SIP provisions.

B. <u>NSR Permitting Program</u>

One Clean Air Act program TCEQ implements is NSR permitting. Under this program, before beginning construction, new sources of air pollution must obtain an NSR permit by establishing, *inter alia*, that emission limits will be consistent with Best Available Control Technology ("BACT") and will be protective of public health. 30 TAC 116.111(a). New sources cannot begin construction until TCEQ issues an NSR permit. 30 TAC 116.110(a).

i. <u>Compliance With the National Ambient Air Quality Standards</u>

13

To demonstrate that emissions will be protective of the public health, NSR permit applicants must perform an air quality analysis to show compliance with the NAAQS. TCEQ, *Air Quality Modeling Guidelines*, at 11 (Jun. 2024).[2] The NAAQS are health-based standards that limit the concentration of "criteria pollutants," in the ambient air (the air that people breathe). 42 U.S.C. 7409. EPA sets the NAAQS at a level "requisite to protect the public health," with "an adequate margin of safety." *Id.* 7409(b)(1). There are six criteria pollutants: carbon monoxide, lead, nitrogen dioxide, ozone, sulfur dioxide and particulate matter ($PM_{2.5}$ and $PM_{10}$). *Air Quality Modeling Guidelines* at 37.

Some criteria pollutants, like $PM_{2.5}$ (particles with diameters of 2.5 microns or less) have multiple NAAQS to account for different averaging periods. One NAAQS is the concentration of $PM_{2.5}$ averaged over a 24-hour period, and the other is an annual average. EPA,

---

[2] STEJN cited this document in the proceedings below, but TCEQ did not include it in the administrative record. *See* ROA.110 n.17. https://www.tceq.texas.gov/downloads/permitting/air/publications/nsr/gi-644-airquality-modeling-guidelines.pdf

*Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, 89 Fed. Reg. 16202, 16202 (Mar. 6, 2024).

An air quality analysis is a thorough, multi-step process. Applicants are required to use computer modeling to determine the combined impact their emissions plus emissions from other area sources will have on ambient concentrations of NAAQS pollutants. *Air Quality Modeling Guidelines* at 17-18. Applicants then add this impact to a representative background concentration (the amount of a pollutant already present in the project area)[3] for a given pollutant and compare this value to the NAAQS to identify potential NAAQS exceedances. *Id.*

Where there is no threat of a NAAQS violation, EPA and TCEQ guidance allow applicants to conduct an abbreviated air quality analysis. Under this approach, applicants model only their impact on

---

[3] The representative background concentration accounts "for sources not explicitly modeled in an air dispersion modeling analysis." *Air Quality Modeling Guidelines* at 43. In other words, by using a representative background analysis, it ensures the air quality analysis accounts for area sources where no data is available and other sources of a pollutant not already included. Additionally, using a representative background concentration, in addition to the area sources included in the computer model, ensures that the analysis is conservative. *Id.*

concentrations of a given pollutant and compare the impact to a
"significant impact level" ("SIL") for the relevant NAAQS. If the
applicant's impact on ambient concentrations is below the applicable
SIL, EPA's guidance allows states to exempt sources from the
comprehensive air quality analysis for that NAAQS. *See* EPA, *Guidance
on Significant Impact Levels for Ozone and Fine Particles in the
Prevention of Significant Deterioration Permitting Program*, at 17 (Apr.
17, 2018) [*EPA SIL Guidance I*];[4] EPA, *Supplement to the Guidance on
Significant Impact Levels for Ozone and Fine Particles in the Prevention
of Significant Deterioration Permitting Program,* at 6 (Apr. 30, 2024)
[*EPA SIL Guidance II*].[5] TCEQ has incorporated EPA's SILs guidance
into its guidance, but instead calls SILs, "*de minimis* levels". *See Air
Quality Modeling Guidelines* at 17. Under both EPA and TCEQ

---

[4] STEJN cited this document in the proceedings below, but TCEQ
did not include it in the administrative record. *See* ROA.114 n.42.
https://www.epa.gov/sites/default/files/2018-
04/documents/sils_policy_guidance_document_final_signed_4-17-18.pdf

[5] STEJN cited this document in the proceedings below, but TCEQ
did not include it in the administrative record. *See* ROA.114-15 n.42.
supplement-to-the-guidance-on-significant-impact-levels-for-ozone-and-
fine-particles-in-the-psd-permitting-program-4-30-2024.pdf

guidance, using a SIL must be justified in the record on a case-by-case basis. *EPA SIL Guidance I* at 19; *EPA SIL Guidance II* at 4; *Air Quality Modeling Guidelines* at 17, 33-35. This case-by-case justification is what allows state permitting agencies and applicants to use the SIL without violating the Clean Air Act. *Sierra Club v. EPA*, 705 F.3d 458, 465 (D.C. Cir. 2013) (SILs cannot be used insofar as they "allow permitting authorities to automatically exempt projects with impacts below the SILs from having to make the demonstration" required by the Clean Air Act).

ii. Best Available Control Technology

The purpose of BACT is to ensure that sources of air pollution have emission limits that reflect the best available control technology. It is defined as:

> An air pollution control method for a new … facility that through experience and research, has proven to be operational, obtainable, and capable of reducing or eliminating emissions from the facility, and is considered technically and economically reasonable for the facility. The emissions reduction can be achieved through technology such as the use of add-on control equipment or by enforceable changes in production processes, systems, methods, or work practice."

17

30 TAC 116.10(1).

In Texas, applicants are required to demonstrate compliance with BACT for all criteria pollutants, using one of two methodologies. The first is EPA's five part, top-down analysis identifying all potential pollution control options, eliminating technically infeasible ones, ranking the options based on effectiveness, and ultimately selecting a numeric pollution limit based one a designated pollution control technology. TCEQ, *Air Pollution Control How to Conduct a Pollution Control* Evaluation, at 11 (Jan. 2011) [*How to Conduct a Pollution Control Evaluation*].[6] The second is TCEQ's three-tier analysis, which begins with a review of recently issued permits in the same process or industry as the applicant, then evaluates recently issued permits in different processes or industries where appropriate, and then, when necessary, does a detailed analysis of all available control options. *Id.* at 11-13. Notwithstanding the tiers, TCEQ's guidance recognizes that

---

[6] STEJN cited this document in the proceedings below, but TCEQ did not include it in the administrative record. *See* ROA.110 n.17. https://www.tceq.texas.gov/assets/public/permitting/air/Guidance/NewSourceReview/airpoll_guidance.pdf

BACT is not static and, therefore, requires the applicant and TCEQ to ensure that all new developments are included in the BACT analysis. *Id.* at 11.

C. Deadline to Begin Construction

Once TCEQ issues an NSR permit, facility construction must begin within 18 months. 30 TAC 116.120(a)(1).

This deadline to begin construction ("construction deadline") can be extended a maximum of three times. "A first extension of 18 months may be granted solely at the request of the permit holder." 30 TAC 116.120(b). TCEQ may grant a second extension "if the permit holder demonstrates that emissions from the facility will comply with all rules and regulations of the commission and the intent of the Texas Clean Air Act ("TCAA"), including protection of the public's health and physical property; and" either "(1) the permit holder is a party to litigation not of the permit holder's initiation regarding the issuance of the permit; or (2) the permit holder has spent, or committed to spend, at least 10% of the estimated total cost of the project up to a maximum of $5 million." *Id.* TCEQ may grant a third extension if the second extension was

19

litigation-based and the permit holder satisfies the conditions for an expenditure-based extension. 30 TAC 116.120(c).

If the permit holder fails to begin construction by the applicable deadline the permit is automatically void. 30 TAC 116.120(a).

D. Extension Application Process

Generally, TCEQ acts through its three commissioners. TWC 5.052(a) (noting that TCEQ is comprised of its three commissioners); TWC 5.102 (setting out the commissioners' powers). However, TCEQ can delegate certain matters to its Executive Director. TWC 5.122. One such delegated matter is authority to act on construction deadline extension requests. 30 TAC 50.131(b)(6). However, the Executive Director may only exercise this delegated authority if she satisfies several conditions. 30 TAC 50.133(a).

There are two ways to appeal the Executive Director's exercise of delegated authority to TCEQ's Commissioners. One is a motion to overturn. *See* 30 TAC 50.139. The other is a request for reconsideration. *See* 30 TAC 55.201. Both remedies provide essentially the same relief—review by the TCEQ Commissioners of the Executive Director's decision.

## III.  Factual Background

Texas LNG has proposed building an LNG export terminal in Cameron County. The Terminal would liquify its feed gas for export to the global LNG market. *See FERC Authorization Order* P5. The Terminal would be sited on a 625-acre parcel of land, *FERC Remand Order* P4, adjacent to the Laguna Atascosa National Wildlife Refuge. *Id.* P67.

Texas LNG applied for an NSR permit to construct the Terminal on March 24, 2016, which TCEQ granted on May 14, 2020, with a November 12, 2021, deadline to begin construction. TCEQ, *An Order Granting the Application by Texas LNG Brownsville LLC for Permit No. 139561*, TCEQ Docket No. 2019-0624-AIR, SOAH Docket No. 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, 2020 WL 2544372 at *1 (May 14, 2020) [*TCEQ Permit Order*].

Texas LNG applied for its first construction deadline extension on September 20, 2021, stating "a first extension of 18 months can be granted solely upon the request of the permit holder." ROA.005. TCEQ granted this extension on October 15, 2021, with a new construction deadline of May 12, 2023.  ROA.009.

21

Texas LNG requested a second construction deadline extension on April 18, 2023, stating it needed this extension because of "litigation concerning the facility's authorization which was not initiated by Texas LNG." ROA.010. Even though Texas LNG's permit became void by operation of law when it failed to start construction by the first extension's May 12, 2023 deadline (30 TAC 116.120(a)(1)) TCEQ granted this second extension on June 8, 2023, with a new construction deadline of November 12, 2024. ROA.020.

On May 13, 2024, Texas LNG applied for the Third Extension. ROA.021. Texas LNG claimed this extension was justified by its expenditures to date and commitments to spend in the future. ROA.022. TCEQ's Executive Director granted this extension on July 22, 2024, with a construction deadline of May 12, 2026. ROA.047.

STEJN filed a motion to overturn the Third Extension on August 14, 2024, and a request for reconsideration of the Third Extension on August 21, 2024. *See* ROA.048, ROA.056.  On August 23, 2024, TCEQ's General Counsel extended TCEQ's deadline to act on STEJN's motion to overturn. ROA.066. In that order, the General Counsel requested additional briefing from the Executive Director, Texas LNG, and

22

TCEQ's Office of the Public Interest Counsel. *Id.* The Office of the Public Interest Counsel is an office within TCEQ "to ensure that the commission promotes the public's interest." TWC 5.271. The Executive Director (ROA.069-78) and Texas LNG (ROA.082-92) submitted briefs arguing that the motion to overturn should be denied. TCEQ's Office of Public Interest submitted a brief arguing that it should be granted. ROA.97-104. STEJN submitted a reply brief, as allowed by the General Counsel's order, addressing the arguments made in the other briefs. ROA.107-19. TCEQ took no action on the motion to overturn or the request for reconsideration.

## SUMMARY OF ARGUMENT

The Third Extension is unlawful.

First, the Executive Director lacked authority to issue the Third Extension. Section II. The Executive Director can only exercise delegated authority to issue an extension decision if several conditions are satisfied. Here, five such conditions were not satisfied, three procedural conditions and two substantive conditions. Accordingly, the Executive Director was not authorized to issue the Third Extension and was required to refer it to TCEQ's Chief Clerk for further proceedings.

23

Second, Texas LNG failed to make several required demonstrations. Section III. At the threshold, Texas LNG's NSR permit was already void when Texas LNG requested, and the Executive Director issued the Third Extension. Section III.A. Additionally, to receive the Third Extension, Texas LNG was required to demonstrate compliance with BACT requirements and the NAAQS. Section III.B. Texas LNG's purported BACT analysis was deficient, so Texas LNG failed to demonstrate compliance with BACT requirements. Section III.B.i. Texas LNG did not attempt to demonstrate NAAQS compliance and, thus, failed to make this required demonstration. Section III.B.ii. These required demonstrations necessarily raised new issues requiring the interpretation of TCEQ policy. Section III.B.iii. As explained in Section II, this means that the Executive Director lacked authority to issue the Third Extension. Texas LNG was also required to demonstrate that it satisfied the expenditure requirements in TCEQ's rules. Section III.C. There is no record evidence indicating that Texas LNG did so. Finally, because Texas LNG failed to make required demonstrations, the Third Extension is not supported by substantial evidence. Section III.D. And, because the Executive Director provided

24

no meaningful reasoning to support the Third Extension, the Third

Extension is arbitrary.

The appropriate remedy is reversal. Section IV.

## ARGUMENT

## I.    Standard of Review

The applicable standard of review is the state standard of review.

*Commonwealth LNG*, 100 F.4th at 562.

The Texas Health and Safety Code, provides "[i]n an appeal of an

action of the commission or executive director ... the issue is whether

the action is invalid, arbitrary, or unreasonable." THSC 382.032(e); *see*

*also AC Interests v. Texas Commission on Environmental Quality*, 543

S.W.3d 703, 707 (Tex. 2018) (holding that where both the Texas Water

Code and Texas Clean Air Act (part of the Texas Health and Safety

Code), could apply, the more specific Texas Clean Air Act provisions

apply to cases involving clean air permitting). This incorporates the

scope of the review from the Texas Administrative Procedure Act. *See*

*Smith v. Houston Chemical Services, Inc.*, 872 S.W.2d 252, 257 n.2 (Tex.

App.—Austin 1994); *United Copper Industries, Inc. v. Grissom*, 17

S.W.3d 797, 801 (Tex. App.—Austin 2000). Accordingly, courts must

"reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (A) in violation of a constitutional or statutory provision; (B) in excess of the agency's statutory authority; (C) made through unlawful procedure; (D) affected by other error of law; (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Texas Government Code 2001.174(2).[7] These grounds for reversal are legal questions that courts review *de novo*. *United Copper Industries, Inc.*, 17 S.W.3d at 801.

## II. The Executive Director Lacked Authority to Grant the Third Extension

The Third Extension is invalid because the Executive Director lacked authority to grant it.

---

[7] This standard of review is analogous to the familiar standard of review in the federal Administrative Procedure Act. *See Starr County v. Starr Indus. Services, Inc.*, 584 S.W.2d 352, 355-56 (Tex.App.—Austin 1979) (describing this standard of review by reference to numerous federal Administrative Procedure Act cases).

The Executive Director can only exercise delegated authority, as she attempted to do here, if she satisfies the conditions in 30 TAC 50.133(a). In her brief opposing STEJN's motion to overturn, the Executive Director did not contest that these conditions applied to her exercise of delegated authority.  Relevant here are three procedural and two substantive conditions.

The three procedural conditions are: (1) satisfying all public notice requirements (30 TAC 50.133(a)(1)); (2) that the Executive Director's staff and public interest counsel do not raise objection (*id.* (a)(4)); and (3) that the application is uncontested (*id.* (a)(5)).

The two substantive conditions are (1) ensuring that the application meets the relevant statutory and administrative criteria; and (2) ensuring that the application does not raise new issues that require the interpretation of TCEQ policy. If the Executive Director fails to satisfy any one of these conditions, the action is invalid. *City of Marshall v. City of Uncertain*, 124 S.W.3d 690, 698-99 (Tex.App.—Austin 2003) (TCEQ's Executive Director could not exercise delegated authority where the conditions of that delegation were not satisfied).

27

Remarkably, the Executive Director failed to satisfy each of these conditions.

**The first procedural bar to the Executive Director exercising delegated authority to decide the Third Extension Application is** 30 TAC 50.133(a)(1), which mandates that "public notice requirements have been satisfied"; those public notice requirements are listed in 30 TAC 50.133(b), and require notice of extension decisions to the applicant, TCEQ's Office of Public Interest Counsel, and to members of the public that submitted comments in response to a public notice. Numerous members of the public submitted comments during the comment period for Texas LNG's NSR permit. ROA.0070-71, 085. But there is no record evidence the Executive Director provided any notice of her decision granting the Third Extension to either TCEQ's Office of Public Interest Counsel or to the members of the public that commented on Texas LNG's permit.

Moreover, the Executive Director's failure to satisfy this public notice requirement was prejudicial to STEJN. STEJN would have received notice of the Executive Director's decision through Rebekah Hinojosa, who is STEJN's co-founder and a leader in the organization.

28

Hinojosa Decl. ¶3. Ms. Hinojosa commented during the initial
permitting proceedings for Texas LNG.[8] The period to file a motion to
overturn is already brief at 23 days. 30 TAC 50.139(b). Had the
Executive Director satisfied her public notice obligations, STEJN would
have been informed of its right to file a motion to overturn at the very
beginning of the motion to overturn window. *See* 30 TAC 50.133(b)
(requiring public notice of the Executive Director's extension decision to
explain the right to file a motion to overturn challenging that decision).
Given that notice, STEJN would have more fully developed the
arguments presented in its motion to overturn, request for
reconsideration, and in this brief. STEJN would have investigated
additional theories, like whether any new pollution control technologies
have been developed since TCEQ issued Texas LNG's NSR permit.
STEJN did this between its motion to overturn, filed on August 14,
2025, and its request for reconsideration, filed on August 21, 2025.

---

[8] TCEQ maintains a list of all the comments received during the
initial permitting proceedings for Texas LNG.
https://www14.tceq.texas.gov/epic/eCID/index.cfm?fuseaction=main.det
ail&item_id=101380112016095&detail=protestants&StartRow=1&End
Row=2&Step=5.. *See also* Hinojosa Decl. ¶6.

ROA.048, ROA.056. In the request for reconsideration, STEJN provided

additional information concerning Texas LNG's failure to perform a

BACT analysis. ROA.063. STEJN could have engaged an expert or

experts to evaluate Texas LNG's impact on annual ambient $PM_{2.5}$

concentrations given EPA's decision to lower the annual $PM_{2.5}$ NAAQS

after TCEQ issued Texas LNG's permit.

**The second procedural bar to the Executive Director**

**exercising delegated authority to decide the Third Extension**

**application was that** TCEQ's Public Interest Counsel "raise[d]

objections" to the Third Extension decision, contrary to 30 TAC

50.133(a)(4).[9] Specifically, the Public Interest Counsel explained that

the Third Extension is error because "[i]t is essential to evaluate

whether Texas LNG's emissions might cause or contribute to a violation

of" the annual $PM_{2.5}$ NAAQS but Texas LNG failed to make such a

---

[9] That the Public Interest Counsel objected only after the General
Counsel asked for its opinion is irrelevant; not only does the rule not
say when the Public Interest Counsel must object, but since the Public
Interest Counsel objected at that point, presumably it would have
objected earlier had the Executive Director given it the notice
required by 30 TAC 50.133(b) or if the Executive Director requested the
Public Interest Counsel's position before issuing the Third Extension.

demonstration, ROA.101, and Texas LNG failed to demonstrate and the Executive Director failed to evaluate "expenditure types, dollar amounts, commitments, and calculations which could be used to assess Texas LNG's eligibility under 30 TAC … 116.120(b)(2)." ROA.103.

**The third procedural bar to the Executive Director exercising delegated authority was that** the Executive Director's extension decision was contested, contrary to 30 TAC 50.133(a)(5)(A). TCEQ's rules provide that the Executive Director can only exercise delegated authority on an application when "the application is uncontested because ... no timely requests for reconsideration ... are filed with the chief clerk." 30 TAC 50.133(a)(5)(A). STEJN did exactly that, timely filing a request with the chief clerk for reconsideration of the Third Extension. ROA.056.

It is worth noting that in response to STEJN's motion to overturn, the Executive Director contested only the issue of public notice, and did not dispute that neither of the other two procedural conditions were satisfied. ROA.070-71.

**The Executive Director also failed to satisfy two related substantive conditions necessary to exercise delegated**

31

**authority to act on the application for the Third Extension; STEJN addresses both in detail in section III(B), below.** Briefly, by failing to demonstrate compliance with BACT requirements and the PM$_{2.5}$ NAAQS, the Third Extension application failed to "meet[] all applicable statutory and administrative criteria" as required by 30 TAC 50.133(a)(2). And the Third Extension Application necessarily "raise[d] new issues that require[d] the interpretation of Commission policy" that the Executive Director summarily decided in concluding that the Third Extension Application met those "relevant statutory and administrative criteria", (*i.e.,* compliance with BACT and the PM$_{2.5}$ NAAQS). But the Executive Director may not decide such new issues interpreting Commission policy under delegated authority. 30 TAC 50.133(a)(3).

In short, by failing to satisfy five separate and necessary conditions, the Executive Director lacked authority to issue the Third Extension. Under TCEQ's rules, any *one* of those five failures *required* the Executive Director to refer Texas LNG's request to TCEQ's Chief Clerk so TCEQ's Commissioners could consider and decide it. 30 TAC 50.133(c).

32

## III.    The Third Extension is Invalid Because Texas LNG Failed to Make the Required Demonstrations

Even if the Executive Director had authority to grant the Third Extension—which she clearly did not—that decision and TCEQ's subsequent failure to overturn it are deficient because Texas LNG failed to satisfy TCEQ's requirements for a third extension.

TCEQ agrees that Texas LNG had to satisfy two conditions to be eligible for the Third Extension. First, compliance with the predicate requirements in 30 TAC 116.120(b) that the permit holder's "emissions ... will comply with all rules and regulations of [TCEQ] and the intent of the [Texas Clean Air Act], including protection of the public's health and physical property." 30 TAC 116.120(b); ROA.046. Second, that the permit holder "has spent, or committed to spend, at least 10% of the estimated total cost of the project up to a maximum of $5 million." 30 TAC 116.120(b)(2). ROA.046.

Texas LNG did not satisfy either of these separate and necessary requirements.

A. Texas LNG's NSR Permit Was Already Void When it Requested the Third Extension

33

But, first, a threshold issue. TCEQ could not grant the Third Extension, because the Permit was already void.

TCEQ's rules state that NSR permits are void if a permit holder fails to begin construction within 18 months of the permit issuing. 30 TAC 116.120(a)(1). The only mechanism to avoid this from occurring is the construction deadline extension process in 30 TAC 116.120(b).

Here, Texas LNG's NSR permit was void before TCEQ issued Texas LNG's second extension. Texas LNG's first extension set a May 12, 2023 deadline to begin construction. ROA.009. On April 18, 2023 Texas LNG requested a second construction deadline extension. ROA.010. However, TCEQ did not grant Texas LNG's second extension request until June 8, 2023. ROA.020. This order was invalid because Texas LNG's NSR permit was already void by operation of law because Texas LNG had not begun construction by the May 12 deadline. "A permit or permit amendment under this chapter is void if the permit holder does one of the following: (1) fails to begin construction within 18 months of issuance [unless an extension is granted]." 30 TAC 116.120(a).

34

TCEQ explicitly noted in the NSR permit, and in the first extension, that if construction did not begin before the applicable deadline, the permit is "automatically void." Permit 139561 at 1 (statement in permit);[10] ROA.009. (TCEQ then repeated this warning in both the second and third extensions; ROA.020, ROA.047.) The Texas Administrative Code does not require TCEQ to issue any order before a permit becomes void. *Cf.* 30 TAC 116.120. Nor does it require the public to take any action to void a permit. *Cf. id.*

That Texas LNG requested an extension prior to its second construction deadline is immaterial. Extensions to the construction deadline in an NSR permit are not tied to when a permit holder requests an extension. Instead, TCEQ's rules provide that permits are voided if construction is not begun by the deadline unless an extension is granted. 30 TAC 116.120(a)(1). There is no provision in TCEQ's rules that states, or suggests, that construction deadlines are stayed if a

---

[10] TCEQ did not include Texas LNG's NSR permit in the administrative record. https://records.tceq.texas.gov/cs/idcplg?IdcService=TCEQ_EXTERNAL_SEARCH_GET_FILE&dID=5232035&Rendition=Web

permit holder requests an extension. Nor does TCEQ have statutory or regulatory authority to stay a construction deadline on this basis.

Texas LNG could have requested this extension earlier to ensure TCEQ had sufficient time to consider the extension request before the permit became void. Texas LNG's second extension was based on the challenge to FERC's approval of the Texas LNG project. ROA.019; *see Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021) (panel remanded, but did not vacate, Texas LNG's authorization). The record provides no reason why, facing a May 12, 2023 construction deadline, Texas LNG waited until April 18 to request an extension based on litigation that concluded in August 2021.[11]

B. <u>Texas LNG Failed to Demonstrate Compliance With TCEQ's Regulations and the Purpose of the Clean Air Act</u>

---

[11] In its request for a third extension, Texas LNG references additional litigation that did not conclude until October 12, 2023. ROA.021. This additional litigation was not referenced in the second extension request and, therefore, was not part of the basis for that extension. Regardless, the presence of this litigation does not explain why Texas LNG waited until April 2023 to request a second construction deadline extension either.

By failing to demonstrate compliance with either BACT or the annual PM$_{2.5}$ NAAQS, the Third Extension request violated the requirement that Texas LNG "demonstrate[d] that emissions from the facility will comply with all rules and regulations of the commission and the intent of the [Texas Clean Air Act], including protection of the public health and property." 30 TAC 116.120(b).

i. <u>Texas LNG Failed to Demonstrate BACT Compliance</u>

Texas LNG claimed that the BACT determinations from the initial permitting process in 2020 satisfied the BACT requirements as they existed when Texas LNG requested the Third Extension in 2024. ROA.022. Texas LNG further stated that "[t]here have been no new control techniques developed since the issuance of this permit; therefore, BACT for the equipment at the facility remains unchanged." *Id.*

Texas LNG's analysis does not establish compliance with current BACT requirements. Texas LNG must evaluate BACT determinations in recently issued NSR permits. *How to Conduct a Pollution Control Evaluation* at 12. There is no record evidence indicating that Texas LNG did that here. Texas LNG claims that it compared its prior BACT

determinations to current BACT requirements as set out in a table it attached to its third extension request, but it is unclear how Texas LNG determined what current BACT is. *See* ROA.037-38.

Additionally, Texas LNG's analysis underscores that it did not perform a sufficient BACT analysis. For example, Texas LNG states that 2024 BACT for the volatile organic compound emissions from its flares[12] was: "Meets 40 CFR 60.18. Destruction Efficiency: 99% for certain compounds up to three carbons, 98% otherwise." ROA.037. But Texas LNG's flares will only achieve a 98% destruction efficiency for all compounds. *Id.* And there is no record evidence that Texas LNG analyzed whether its flares could achieve the 99% destruction removal efficiency for compounds with three carbons or less, effectively conceding it is not satisfying BACT requirements for these emissions.[13]

---

[12] While volatile organic compounds are not themselves criteria pollutants, they are precursors for ozone and, therefore, are subject to BACT requirements.

[13] In addition, there is no record evidence that Texas LNG analyzed even more stringent flare requirements, like combustion zone operating limit requirements in 40 C.F.R. 63.670(e). These requirements require minimum heating requirements in the combustion zone of a flare to ensure combustion efficiency in the flares.

Similarly, Texas LNG states that 2024 BACT for its nitrogen oxide emissions from its thermal oxidizers is low NOx burners to achieve 0.06 lb/MMBtu "<u>or less</u>" of nitrogen oxide emissions. *Id.* Texas LNG has a 0.06 lb/MMBtu limit for these emissions, i*d.*, but there is no record evidence that Texas LNG evaluated whether it could achieve a *lower* limit.

Texas LNG's analysis also omits other potential BACT options. For example, 2020 BACT for Texas LNG's HTF Heaters is to use Ultra-Low NOx Burners to achieve a nitrogen oxide limit of 0.015 lb/MMBtu. ROA.038. But during the initial permitting process, TCEQ acknowledged that "top-tier BACT" is a lower limit of 0.01 lb/MMBtu; TCEQ determined that the higher limit is justified for cost reasons. TCEQ, *Construction Permit Source Analysis & Technical Review for Project No. 250128*, at 5 (May 7, 2020).[14] But TCEQ was careful to note that this BACT determination was limited to the facts at the time, on a

---

[14] STEJN cited this document in the proceedings below, but TCEQ did not include it in the administrative record. *See* ROA.051 n.23. https://records.tceq.texas.gov/cs/idcplg?IdcService=TCEQ_EXTERNAL_SEARCH_GET_FILE&dID=5288674&Rendition=Web

"case-by-case basis." *TCEQ Permit Order* at *6. Here, Texas LNG did

not assess whether the lower limit is now economically feasible, *cf*.

AR038, despite being required to do so. *See* 30 TAC 116.10(1) (requiring

consideration of cost in a BACT analysis). Texas LNG also failed to

assess whether carbon capture and storage is BACT for Texas LNG's

carbon dioxide emissions. ROA.037-38. In response to STEJN's motion

to overturn, the Executive Director acknowledged this is, indeed, "a

potential control method" for these emissions. ROA.075.[15] Thus, TCEQ's

rules require that it be assessed. *How to Conduct a Pollution Control*

*Evaluation* at 11 ("Failure to consider all potentially applicable control

alternatives constitutes an incomplete BACT analysis."); *Friends of*

*Buckingham v. State Air Pollution Control Board*, 947 F.3d 68, 72 (4th

---

[15] The Executive Director also argued that Texas LNG was not
required to evaluate BACT for carbon dioxide emissions because Texas
LNG's permit is not a prevention of significant deterioration permit.
ROA.075. This is wrong. Greenhouse gas emissions are subject to
prevention of significant deterioration review if certain emissions
thresholds are met. 30 TAC 116.111(a)(2)(I). However, greenhouse gas
emissions are not exempted from the general BACT requirements in 30
TAC 116.111(a)(2)(C).

Cir. 2020) (failure to consider a potentially available BACT alternative is "clear error").

For these reasons, as effectively conceded by both the Executive Director and Texas LNG in the proceedings below, Texas LNG's BACT analysis in support of the Third Extension is deficient. ROA.074 (Executive Director), ROA.88-90 (Texas LNG). Texas LNG failed to provide a record that is "is sound, comprehensive, and adequately supports the conclusions of the BACT review." *How to Conduct a Pollution Control Evaluation* at 12; *Alaska Dept. of Environmental Conservation v. EPA*, 540 U.S. 461, 497-500 (2004) (where a record supporting a BACT determination is deficient, the BACT determination itself is deficient).

> ii. Texas LNG Failed to Demonstrate Compliance with the Annual PM$_{2.5}$ NAAQS

As both the Executive Director and Texas LNG conceded below, Texas LNG did not even attempt to demonstrate that its emissions would be protective of public health. ROA.072-73 (Executive Director); ROA.090-91 (Texas LNG). Texas LNG's extension request makes no reference to the NAAQS. ROA.021-22. Accordingly, as TCEQ's Office of

Public Interest Counsel agrees, Texas LNG simply failed to make a required demonstration. ROA.101. Without the required analysis, there is no way to determine whether Texas LNG's emissions will be protective of public health. But there is good reason to think that they are not, especially concerning compliance with the annual $PM_{2.5}$ NAAQS.

When TCEQ initially issued Texas LNG's permit the annual $PM_{2.5}$ NAAQS was 12.0 μg/m³. EPA, *Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, 89 Fed. Reg. 16202, 16208-09 (Mar. 6, 2024) (explaining that the NAAQS for annual $PM_{2.5}$ was 12.0 μg/m³ beginning in January 2013 and through 2020). But EPA lowered the annual $PM_{2.5}$ NAAQS to 9.0 μg/m³ on May 6, 2024, prior to Texas LNG's third extension request because the prior NAAQS was insufficiently protective of public health. *Id.* at 16203-04. Thus, to establish that its $PM_{2.5}$ emissions will be protective of public health now, Texas LNG must demonstrate compliance with the current NAAQS. As explained, Texas LNG did not do that.

Uncontroverted record evidence indicates that Texas LNG's emissions may contribute to exceedances of the current annual $PM_{2.5}$

NAAQS. During the initial permitting process, TCEQ determined that the existing background concentration of annual $PM_{2.5}$ was already 9.1 µg/m³, exceeding the current NAAQS. TCEQ, *Construction Permit Source Analysis & Technical Review Project No. 250128*, at 7 (May 7, 2020). Thus, any $PM_{2.5}$ emissions from Texas LNG may contribute to a NAAQS exceedance and are not protective of public health. Additionally, this initial analysis is now stale. During recent FERC proceedings, FERC determined that the background concentration is now higher, 10.13 µg/m³. *FERC Remand Order* at B-27. And the background concentration may be even higher. The United States Court of Appeals for the D.C. Circuit held that FERC's refusal to consider a higher background concentration rendered its approval of Texas LNG arbitrary. *See City of Port Isabel v. Federal Energy Regulatory Commission*, 111 F.4th 1198, 1214-15 (D.C. Cir. 2024).

In response to STEJN's motion to overturn, Texas LNG argued that its failure to demonstrate compliance with the annual $PM_{2.5}$ NAAQS is excused because during the initial permitting process, Texas LNG determined its impact is below the current annual $PM_{2.5}$ SIL. ROA.090-91. According to Texas LNG, this means it has already

demonstrated that compliance with the current annual PM$_{2.5}$ NAAQS. This argument is meritless for at least two reasons.

First, Texas LNG has not established that using the SIL is appropriate to demonstrate annual PM$_{2.5}$ NAAQS compliance for the Third Extension. Any use of a SIL must be "justified in the record" on a case-by-case basis. *EPA SIL Guidance I* at 19; EPA, *EPA SIL Guidance II* at 4; *see also Air Quality Modeling Guidelines* at 17. This requires consideration of "any additional information in the record that is relevant to making the required demonstration." *EPA SIL Guidance I* at 19. One relevant factor is whether the gap between the background concentration and the NAAQS for a given pollutant and averaging period is smaller than the SIL for that pollutant and averaging period. *Id.* at 10. Where that is the case, the SIL cannot be used to avoid a comprehensive NAAQS analysis. *Id.* Such is the case here, because the annual PM$_{2.5}$ in the area around Texas LNG is already above the SIL. As a result, Texas LNG cannot use the SIL here. Additionally, because no analysis was performed, Texas LNG made no attempt to justify using the SIL.

44

Second, FERC has concluded that Texas LNG's impact on annual ambient $PM_{2.5}$ concentrations is actually over the SIL. The current SIL is 0.13 µg/m³. *EPA SIL Guidance II* at 6. FERC determined that Texas LNG's impact would be 0.17 µg/m³. *FERC Remand Order* at B-27. Thus, even if Texas LNG had justified using the SIL, it could not use the SIL to avoid a comprehensive air quality analysis for the annual $PM_{2.5}$ NAAQS. *Air Quality Modeling Guidelines* at 17-18.

Ultimately, the only way to determine whether Texas LNG's emissions will comply with the NAAQS and be protective of public health is for Texas LNG to perform the required analysis. *Id.* This is especially important here, where the record includes a number of factors that suggest that Texas LNG's emissions do not comply with the NAAQS and be protective of public health for at least one pollutant.

     iii.  <u>The Required BACT and NAAQS Analyses Raise New Issues That Require the Interpretation of TCEQ Policy</u>

These demonstrations necessarily require several interpretations of TCEQ policy. *See supra* Section II.

For example, a BACT analysis requires applicants and application-reviewers to make case-by-case determinations, using

45

reasoned judgment, to determine the appropriate emission limit for a given stream of emissions. *How To Conduct a Pollution Control Evaluation* at 16 (explaining the case-by-case nature of a BACT analysis and the reasoned judgment that permit reviewers are required to exercise); ROA.075 (explaining that, for potentially applicable control technologies, applicants and permit reviewers must assess "a series of requirements, including a backing of experience and research showing that the technology is 'operational, obtainable, and capable o[f] reducing or eliminating emissions.'").

Additionally, an air quality analysis requires interpreting TCEQ policy to determine an appropriate background concentration or to justify the use of a SIL. *Air Quality Modeling Guidelines* at 43 (explaining the reasoned judgment that permit reviewers are required to exercise when determining the appropriate representative background monitor for an air quality analysis), 17 (SIL).

In addition to the application simply raising issues that require the interpretation of TCEQ policy, the issues are brand new; there is nothing in the record showing that TCEQ has ever interpreted these policies in the context of a permit extension. Neither of the briefs

46

submitted by the Executive Director and Texas LNG opposing STEJN's motion to overturn attempted to argue otherwise. *See* ROA.068-77, ROA.82-92.

C. Texas LNG Failed to Demonstrate Compliance with the Expenditure Requirements

To receive its third extension, Texas LNG was required to establish that it "has spent, or committed to spend, at least 10% of the estimated total cost of the project up to a maximum of $5 million." 30 TAC 116.120(b)(2). There is no record evidence indicating that Texas LNG has satisfied this requirement. Below, TCEQ's Office of Public Interest Counsel agreed. ROA.103

In its third extension request, Texas LNG states that it "spent more than the $5 million maximum threshold value on the project," because "[k]ey actual project expenditures sum to more than $5 million." ROA.022. As support for this statement, Texas LNG included an attachment with its request. *Id.* But, this attachment was submitted as "confidential business information," *id.*, and, thus, the information included therein is not in the record. *See* ROA.036. Texas LNG also

47

states that it has committed to unspecified future expenditures, but did not include any details concerning those commitments. ROA.022.

Because the record lacks any information to substantiate Texas LNG's claims, Texas LNG failed to establish it satisfied the expenditure requirements. To begin, it is impossible to verify that Texas LNG has spent more than $5,000,000 on the project. Insofar as Texas LNG did, it is impossible to assess whether some or all of those expenditures are qualifying expenditures under TCEQ's rules. Insofar as Texas LNG did not, it is impossible to determine whether any of Texas LNG's purported future commitments can justify the Third Extension.

That Texas LNG claims the support for its claims is confidential, does not change this analysis. The relevant confidentiality provision, *see* ROA.088, only protects "information submitted to the commission relating to secret processes or methods of manufacture or production." THSC 382.041(a). There is no reason why Texas LNG cannot demonstrate its compliance with the expenditure requirements here without disclosing the information covered by this provision because expenditures can be disclosed without also disclosing specific secret processes or methods. Even if that weren't the case, Texas LNG simply

48

could have submitted any confidential information under seal, but did not do so.

### D. Because Texas LNG Failed to Make any of the Required Demonstrations, the Third Extension is Unlawful

Despite Texas LNG's failure to make any of the required demonstrations, the Executive Director granted the Third Extension. In doing so, the Executive Director determined that: (1) Texas LNG "satisfies the conditions given in 30 TAC ... 116.120(c)," (2) Texas LNG "demonstrated compliance with current BACT," (3) Texas LNG "has not made changes to the previously authorized project, which was demonstrated to be protective of human health," and (4) that Texas LNG satisfied the expenditure requirements in TCEQ's rules. ROA.046. None of these conclusions are supported by the record.

That is because Texas LNG did not make any of its required demonstrations. Without an adequate BACT analysis or any air quality analysis, there is no support for the Executive Director's conclusions that Texas LNG demonstrated compliance with current BACT and that its emissions will be protective of the public health. That TCEQ initially determined that Texas LNG's emission limits are consistent with BACT

49

and its emissions would be protective of public health is irrelevant.
ROA.046. As explained above, BACT is always subject to change and
EPA lowered the annual PM$_{2.5}$ NAAQS. And without any information
concerning Texas LNG's expenditures, there is no support for the
Executive Director's conclusion that Texas LNG satisfied the
expenditure requirements.

For this reason, this Court should reverse the Third Extension.
Agency action must be supported by substantial evidence. *Park Haven,
Inc. v. Texas Dept. Of Human Services* is on point. There, the Texas
Department of Human Service's decision to assess an administrative
penalty against a nursing home was not supported by substantial
evidence. 80 S.W.3d 211, at 214-15 (Tex.App.—Austin 2004). The only
evidence supporting one of the necessary factors to assess the
administrative penalty, the consideration of compliance history, was
testimony that provided a "general description of what *usually* occurs in
the assessment process." *Id.* at 215 (emphasis in original). Meanwhile,
there was no record evidence of the nursing facility's actual compliance
history or that the agency considered that information. *Id.* at 214-15.
The court there held that the record was insufficient to sustain the

agency's decision to assess the administrative penalty. The same is true here. There just is not any evidence in the record that would allow the Executive Director to conclude that Texas LNG made the required demonstrations.  As a result, the Third Extension is unlawful.

Not only is the Executive Director's decision not supported by substantial evidence, the Executive Director failed to explain how any of the facts in in the record support her decision to issue the Third Extension. Agency "decision[s] must manifest a rational connection to the facts," but the Executive Director's decision here does not. *Oncor Elec. Delivery LLC v. Public Utility Com'n of Texas*, 406 S.W.3d 253, 264-65 (Tex.App.—Austin 2013) (holding that an action by the Public Utility Commission of Texas was arbitrary because it failed "to provide any analysis explaining" how its rationale supported its decision). The Executive Director's reasoning for her decision to issue the Third Extension is comprised of three bullet points. ROA.046-47. Each are mere conclusory statements that Texas LNG satisfied the various requirements. This is not enough. For this reason as well, the Court should reverse the Third Extension.

51

## IV.    Remedy

The proper remedy is for the Court to reverse the Third Extension. Texas Government Code 2001.174(2). The error here is total. As a result, the practical effect of reversal is that, should Texas LNG wish to continue pursuing its project, it will have to seek a new NSR permit.

## CONCLUSION

STEJN respectfully requests that this Court reverse the Third Extension.

Dated: April 14, 2025

Respectfully submitted,

**_s/ Thomas Gosselin_**
Thomas Gosselin
Environmental Integrity Project
98 San Jacinto Boulevard
Suite 400
Austin, TX 78701
Telephone: (512) 316-7194
tgosselin@environmentalintegrity.org
*Attorney for STEJN*

## CERTIFICATE OF SERVICE

I hereby certify that on April 14, 2025, I electronically filed the foregoing Initial Brief of Petitioner with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.


s/ *Thomas Gosselin*
Thomas Gosselin

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure Rule 32, I certify that this brief complies with:

1) the type-volume limitations of Rule 32(a)(7) because it contains 9,356 words, excluding the parts of the brief exempted by Rule 32(f); and

2) the typeface and type style requirements of Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced typeface (14-point) using Microsoft Word (the same program used to calculate the word count).

s/ ***Thomas Gosselin***
Thomas Gosselin

## CERTIFICATE OF ELECTRONIC COMPLIANCE

I further hereby certify that in the foregoing brief filed using the

Fifth Circuit CM/ECF document filing system, (1) the privacy

redactions required by Fifth Circuit Rule 25.2.13 have been made, and

(2) the electronic submission is an exact copy of the paper document.


_**s/ Thomas Gosselin**_
Thomas Gosselin